PEOPLE v ENGLAND

Docket No. 99838. Submitted November 8, 1988, at Lansing. Decided April 4, 1989.

Trevor C. England was convicted of two counts of involuntary manslaughter following a bench trial in Oakland Circuit Court, Frederick C. Ziem, J. The criminal charges arose out of the deaths of the occupants of an automobile which defendant hit while driving his pickup truck. At trial, the court permitted, over a defense objection, the introduction of evidence of defendant's blood alcohol level which had been obtained by the analysis of a blood sample which had been taken at a hospital following the accident for medical purposes. The court also permitted an accident reconstruction witness to testify as to the question of whether defendant had stopped at a stop sign prior to hitting decedents' automobile. Defendant appealed.

The Court of Appeals *held*:

1. There was sufficient evidence to support the trial court's finding that defendant was grossly negligent; accordingly, there was sufficient evidence to support the finding that defendant was guilty of involuntary manslaughter.

2. The trial court properly allowed the testimony of the accident reconstruction expert concerning the tests he ran to determine the likelihood that defendant could have been traveling at the speed he was traveling at the point of impact if he had stopped at the stop sign, even though the test was carried out in a 1984 pickup truck, while defendant was driving a 1970 pickup truck.

3. The provision in the implied consent statute permitting the prosecution to secure the blood test results analyzing a blood sample taken for medical purposes by a medical facility and use the results for the purpose of establishing blood alcohol levels is not violative of the constitutional rights to be free

REFERENCES

Am Jur 2d, Automobiles and Highway Traffic §§ 305-308; Expert and Opinion Evidence §§ 104-110, 116; Negligence §§ 243-254; Searches and Seizures §§ 39, 105.

Admissibility of test results where blood was taken despite defendant's objection or refusal to submit to test. 14 ALR4th 690.

from unreasonable searches and seizures and to equal protection of the laws.

Affirmed.

1. NEGLIGENCE — GROSS NEGLIGENCE.

A finding of gross negligence requires proof of (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another, (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) the omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

2. WITNESSES — EXPERT WITNESSES — OPINION TESTIMONY.

An expert witness need not actually witness an event in order to render an opinion regarding it; the opinion of an expert witness may be based on facts and assumptions gathered by nonexperts.

3. EVIDENCE — EXPERT TESTIMONY — TEST RESULTS.

It is not necessary that the conditions of a test be exactly identical to the conditions existing at the time of an accident before evidence of an expert's test results may be admitted, but a reasonable or substantial similarity is sufficient.

4. SEARCHES AND SEIZURES — BLOOD TESTS — IMPLIED CONSENT STATUTE — MEDICAL TREATMENT — EQUAL PROTECTION.

The provision in the implied consent statute providing that a prosecutor may secure and use in evidence in a criminal prosecution to show the blood alcohol level of an accused the results of the chemical analysis of a blood sample taken by a medical facility for the purpose of medical treatment is not violative of either the federal or Michigan constitutional right against unreasonable searches and seizures; nor does that provision violate the constitutional right to equal protection of the law (US Const, Am IV, Am XIV; Const 1963, art 1, §§ 1, 11; MCL 257.625a[9]; MSA 9.2325[1][9]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Paul J. Fischer,* Assistant Prosecuting Attorney, for the people.

*John D. Lazar,* for defendant.

Before: MacKenzie, P.J., and Weaver and E. A. Quinnell,* JJ.

Per Curiam. Defendant appeals as of right from his bench conviction of two counts of involuntary manslaughter, MCL 750.321; MSA 28.553. Defendant was sentenced to concurrent terms of imprisonment of three to fifteen years.

At approximately 1:30 A.M. on June 8, 1985, defendant, driving a 1970 Chevrolet pickup truck, was involved in a collision with a 1983 Ford Tempo. The collision occurred at the intersection of Hickory Ridge Road and Rose Center Road in Rose Township, Oakland County. The occupants of the Ford car, Robert and Cecelia Bosak, were killed in the collision.

Following the collision, defendant was taken to the emergency room of a nearby hospital for treatment of various lacerations. Pursuant to the order of the supervising physician, blood was withdrawn from defendant for the purposes of medical treatment. An analysis of the blood sample indicated a blood alcohol level of 0.165 percent. Over defendant's objection, the results of the blood-alcohol test were admitted as evidence under MCL 257.625a(9); MSA 9.2325(1)(9).

The trial court issued its decision from the bench. The court found, as a matter of fact, that (1) the defendant had disregarded and failed to stop at the stop sign posted at the Hickory Ridge and Rose Center intersection, (2) the defendant failed to yield the right-of-way at the intersection, and (3) defendant was under the influence of intoxicating liquors at the time of the accident. The court concluded that the prosecution had proven, beyond a reasonable doubt, that the defendant was guilty of gross negligence, resulting in the death of

* Circuit judge, sitting on the Court of Appeals by assignment.

the Bosaks. On appeal, defendant argues he is entitled to reversal of his conviction because the conviction was not supported by sufficient evidence, the results of the blood-alcohol test were erroneously admitted, and testimony of the prosecution's expert witness was not supported by an adequate factual foundation.

Subsequent to trial in this matter, a panel of this Court issued its opinion in *People v Perlos,* 170 Mich App 75; 428 NW2d 685 (1988), holding MCL 257.625a(9); MSA 9.2325(1)(9) unconstitutional in that it permits unreasonable searches and seizures of drivers' blood in violation of the federal and state constitutions, US Const, Am IV; Const 1963, art 1, § 11, and violates state and federal guarantees of equal protection, US Const, Am XIV, § 1; Const 1963, art 1, § 1. We fundamentally disagree with the *Perlos* decision[1] and will devote the majority of this opinion to our analysis of the constitutional issue. However, we will first briefly discuss the other two issues raised by defendant, neither of which requires reversal.

I

We review defendant's claim of insufficient evidence to support his conviction for involuntary manslaughter by looking at the evidence in the light most favorable to the prosecution and then determining whether a rational trier of fact could find all of the essential elements of the crime were proven beyond a reasonable doubt. *People v Petrella,* 424 Mich 221, 268-270; 380 NW2d 11 (1985). The crime of involuntary manslaughter is established upon a showing that the defendant acted in a grossly negligent, wanton or reckless fashion in

[1] We note that the Court of Appeals granted rehearing in *Perlos* on December 8, 1988.

causing the death of another. *People v Harris,* 159 Mich App 401, 406; 406 NW2d 307 (1987). Defendant argues that the evidence was insufficient to prove him grossly negligent beyond a reasonable doubt. We disagree.

Gross negligence requires:

> "1. Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.
> "2. Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand.
> "3. The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." *People v Orr,* 243 Mich 300, 307; 220 NW 777 (1928); CJI 16:4:08. [*People v Sealy,* 136 Mich App 168, 172-173; 356 NW2d 614 (1984), lv den 422 Mich 854 (1985).]

The first element is satisfied because the operation of an automobile requires the exercise of ordinary care and diligence. *People v Allan,* 158 Mich App 472, 475; 404 NW2d 266 (1987). Furthermore, the evidence showed that the intersection of Hickory Ridge Road and Rose Center Road was a particularly dangerous intersection due to a dip on Hickory Ridge Road which rendered it difficult for drivers on Rose Center Road who were approaching the intersection to see a vehicle in the dip. Several witnesses testified that drivers familiar with the intersection were aware of the particular danger, and, when approaching the intersection on Rose Center Road, stopped not only at the stop sign, which was posted fifty-six feet before the intersection, but again at fourteen feet from the intersection where the Hickory Ridge Road traffic

was easier to view. By defense counsel's own admission, defendant lived in the area for at least fifteen years. A rational trier of fact could have inferred that the defendant knew of the particular dangers presented by the intersection and that the exercise of ordinary care and diligence was necessary to prevent injury to another.

The second and third elements were satisfied as well. While the intersection was potentially dangerous, evidence was presented that no fatal accident had occurred at the intersection in twenty-four years and that harm could be avoided by the exercise of ordinary care and diligence. While testimony concerning defendant's failure to stop at the posted stop sign on Rose Center Road and his driving at an excessive rate of speed were disputed, the trial court's finding that defendant failed to stop at the sign or yield the right of way was certainly not clearly erroneous. Thus, even in the absence of the evidence of defendant's intoxication, a rational trier of fact could have found that, under the circumstances (night time, defendant's familiarity with the intersection, excessive speed, and failure to stop at the posted stop sign), defendant omitted to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

II

Defendant also contends the trial court erred in admitting the testimony of Michigan State Police Trooper Richardson, an expert in accident reconstruction. We disagree.

The determination as to the qualification and admissibility of expert testimony is within the trial court's discretion and will not be reversed on

appeal absent a showing of abuse of that discretion. *People v Badour,* 167 Mich App 186, 192; 421 NW2d 624 (1988). The critical inquiry with respect to admitting expert testimony is whether such testimony will aid the factfinder in making the ultimate decision in the case. *Kinzie v AMF Lawn & Garden, Division of AMF, Inc,* 167 Mich App 528, 533; 423 NW2d 253 (1988), citing *People v Smith,* 428 Mich 98, 105; 387 NW2d 814 (1986). An opposing party's disagreement with an expert's interpretation of the facts, or the expert's ultimate opinion, is an issue of credibility or weight of the testimony, not admissibility. *Eide v Kelsey-Hayes Co,* 154 Mich App 142, 155; 397 NW2d 532 (1986), modified on other grounds 431 Mich 26 (1988).

Defendant did not dispute Trooper Richardson's qualification as an expert in accident reconstruction. The record reflects that Richardson's testimony was helpful to the trier of fact. Specifically, his testimony with respect to the speed of the respective vehicles prior to the collision was critical to a factual determination of whether defendant had stopped at the posted stop sign or yielded the right of way. Additionally, Richardson's testimony regarding which vehicle hit the other, based on his examination of the damage to the vehicles, was also helpful on the issue of defendant's possible negligent conduct. Defendant's assertion that much of Trooper Richardson's testimony was not based on "first-hand knowledge," but rather on facts and assumptions gathered by nonexperts, would not preclude its admission. *Gainey v Sieloff (On Remand),* 163 Mich App 538, 545; 415 NW2d 268 (1987).

Defendant also argues that Trooper Richardson's testimony regarding the speed tests he conducted using a 1984 pickup truck was irrelevant to the determination of the acceleration capacity of de-

fendant's 1970 vehicle given the mechanical differences between the two vehicles. In considering the admissibility of test results, it is not necessary " 'that the conditions should be exactly identical, but a reasonable or substantial similarity is sufficient.' " *Jenkins v Frison Building Maintenance Co,* 166 Mich App 716, 719; 421 NW2d 275 (1988), quoting *Smith v Grange Fire Ins Co of Michigan,* 234 Mich 119, 126; 208 NW 145 (1926).

> "[T]he lack of exact identity affects only the weight and not the competency of the evidence, provided always that there is such a degree of similarity that evidence of the experiments made will accomplish the desideratum of assisting the jury to an intelligent consideration of the issues of fact presented." [*Id.*]

The speed tests conducted by Richardson were particularly relevant to the issue of whether defendant had failed to stop at the stop sign, i.e., whether, given the speed of defendant's truck at the time of impact, it was possible for defendant to have reached that speed by the point of impact if he had stopped at the stop sign. Any defects in similarity between the speed test vehicle and defendant's vehicle did not undermine the usefulness of the evidence since it is highly probable that, if a much newer truck could not have reached thirty-seven miles per hour (the estimated minimum speed at impact) if it had stopped at the stop sign, defendant's much older "rust bucket" would not have been able to have reached thirty-seven miles per hour if defendant had stopped at the stop sign. The trial court did not abuse its discretion in admitting Trooper Richardson's testimony.

III

Defendant England was not under arrest when

he was taken to the hospital following the accident. The record appears to indicate that defendant was, at least, semiconscious upon his arrival at the hospital. It is undisputed that defendant's blood was drawn for purposes of medical treatment. One of the medical tests performed on the blood sample was a blood alcohol level test. The prosecutor obtained the hospital records containing the blood alcohol test results under MCL 257.625a(9); MSA 9.2325(1)(9) which provides:

> If after an accident the driver of a vehicle involved in the accident is transported to a medical facility and a sample of the driver's blood is withdrawn at that time for the purpose of medical treatment, the results of a chemical analysis of that sample shall be admissible in a criminal prosecution for a crime described in subsection (1) to show the amount of alcohol or presence of a controlled substance or both in the person's blood at the time alleged, regardless of whether the person had been offered or had refused a chemical test. The medical facility or person performing the chemical analysis shall disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution as provided in this subsection. A medical facility or person disclosing information in compliance with this subsection shall not be civilly or criminally liable for making the disclosure.

Subsection (9) was added in 1982 when the Legislature amended the implied consent statute, MCL 257.625a; MSA 9.2325(1).

In *Perlos, supra,* p 88, a panel of this Court held subsection (9) unconstitutional because it allows a search and seizure without a warrant to be performed prior to arrest and without consent and in

the absence of exigent circumstances. The Court further found subsection (9) violative of the constitutional guarantee of equal protection by denying conscious drivers who are in the hospital the same opportunity to refuse a blood test as is given to conscious drivers who are not in the hospital.

To sustain an attack on the propriety of a search or seizure, the challenged search or seizure must have infringed upon an interest which article 1, § 11 of the Michigan Constitution or the Fourth Amendment of the United States Constitution was designed to protect. *People v Smith*, 420 Mich 1, 28; 360 NW2d 841 (1984). Thus, our inquiry begins with the question of whether a search or seizure occurred which activated the constitutional protections. To be within the protections of the Fourth Amendment, the search must be performed by government agents or be a form of state action. *United States v Jacobson*, 466 US 109; 104 S Ct 1652; 80 L Ed 2d 85 (1984); *Perlos, supra,* p 81. The *Perlos* panel concluded that the withdrawal of blood under subsection (9) involved "sufficient governmental participation and authorization . . . to constitute state action." *Perlos, supra,* p 83.

The Court believed there to be "very little distinction for Fourth Amendment purposes between a prior request that blood be withdrawn and tested and a statutory mandate that once blood is withdrawn and tested, it must be turned over to the state." *Perlos, supra,* p 82. The latter analysis, however, fails to recognize the distinction between the withdrawal of the blood and the turning over of blood test results to the state.

The "search" performed here, i.e., the removal of the blood sample from defendant, was done strictly for purposes of medical treatment and not at the direction of the police, the prosecutor, or

state agents.[2] Thus, the actual removal of the blood sample is not a search protected by the Fourth Amendment, since state action is not involved. Courts in other states have reached a similar conclusion. See *Nelson v State,* 650 P2d 426 (Alas, 1982); *State v Jenkins,* 80 Wis 2d 426; 259 NW2d 109 (1977); *Turner v State,* 258 Ark 425; 527 SW2d 580 (1975); *State v Enoch,* 21 Ore App 652; 536 P2d 460 (1975); *Commonwealth v Gordon,* 431 Pa 512; 246 A2d 325 (1968), cert den 394 US 937; 89 S Ct 1215; 22 L Ed 2d 469 (1969).

The state's involvement consists of the seizure of the blood test results. Is such a seizure protected by the Fourth Amendment? The Michigan Supreme Court has adopted a two-pronged test which must be met to find that the object of a search and seizure is protected by the Fourth Amendment: (1) Did the defendant have a subjective expectation of privacy in the object of the search and seizure? (2) If so, is that expectation of privacy objectively reasonable, i.e., is that expectation one that society is prepared to recognize as reasonable? *People v Catania,* 427 Mich 447, 457; 398 NW2d 343 (1986), reh den 428 Mich 1206 (1987); *Smith, supra,* p 28.

Defendant has satisfied the first prong of the *Smith/Catania* test. We agree that he has a subjective expectation of privacy in his medical records

---

[2] If the police had directed the hospital staff to take the blood sample, the Fourth Amendment protections would apply. However, the United States Supreme Court has held that no Fourth Amendment violation occurs where blood is taken from a defendant at the government's order, without a warrant, and over the defendant's objection. *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966). In light of *Schmerber,* prior Michigan law holding such a search unconstitutional, *Lebel v Swincicki,* 354 Mich 427; 93 NW2d 281 (1958), is probably no longer good law. *People v Keen,* 396 Mich 573, 580; 242 NW2d 405 (1976); *People v Cords,* 75 Mich App 415, 422; 254 NW2d 911 (1977). However, under Michigan law, in the absence of a warrant, the state must follow the procedure set forth in MCL 257.625a(4); MSA 9.2325(1)(4) in order to direct the taking of a blood sample. *Keen, supra,* p 576; *Cords, supra,* pp 420-421.

as a consequence of the doctor-patient privilege, MCL 600.2157; MSA 27A.2157. However, the doctor-patient privilege was not recognized at common law. The privilege is an evidentiary rule, created by statute, and the scope of the privilege is determined by the privilege statute. *People v Boucher,* 131 Mich App 216, 220; 345 NW2d 670 (1983), lv den 419 Mich 911 (1984).

By enacting subsection (9) of the implied consent statute, the Legislature has chosen to limit the scope of the evidentiary privilege. By doing so, the people of the State of Michigan, through the action of their Legislature, have indicated that they do not recognize a reasonable expectation of privacy in the results of a blood alcohol test taken from the driver of a car in an accident, where the test was administered by a hospital staff pursuant to medical treatment or diagnosis.

We do not find society's view on expectation of privacy as evidenced by subsection (9) to be a dramatic departure from its views on this matter expressed elsewhere. Under the implied consent law, every person who operates a vehicle upon a public highway is considered to have given consent to a chemical test of the person's blood, breath, or urine for determining the presence of alcohol or drugs. MCL 257.625c; MSA 9.2325(3). While a person arrested may refuse to consent to such a test, the consequence of a refusal is the suspension of the person's license and the automatic addition of six points to the person's driving record. MCL 257.625a(6); MSA 9.2325(1)(6). Moreover, notwithstanding the right to refuse consent, a court may nonetheless order the person to take the test. MCL 257.625a(6); MSA 9.2325(1)(6). Given the recognized expectations of society regarding the withdrawal of blood for purposes of administering a chemical test at the government's order, it is

hardly surprising that society is prepared to recognize as reasonable the government's right to obtain the results of a blood test where the test had been administered for medical treatment.

We therefore conclude that subsection (9) of the implied consent statute is not unconstitutional under either US Const, Am IV or Const 1963, art 1, § 11.

IV

In *Perlos, supra,* pp 89-90, this Court also found subsection (9) of § 625a to be violative of the federal and state guarantees of equal protection. US Const, Am XIV, § 1; Const 1963, art 1, § 1. The Court believed that no rational basis existed for classifying injured drivers who are not arrested and taken to the hospital differently from arrested drivers who are offered the opportunity to refuse consent to a blood test. We cannot agree.

In *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975), the Michigan Supreme Court set forth a two-tiered test for equal protection challenges:

> If the interest is "fundamental" or the classification "suspect," the court applies a "strict scrutiny" test requiring the state to show a "compelling" interest which justifies the classification. Rarely have courts sustained legislation subjected to this standard of review.
>
> Other legislation, principally social and economic, is subjected to review under the traditional equal protection test. The burden is on the person challenging the classification to show that it is without reasonable justification. It has been said that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." A classification will stand unless it is shown to be "essentially arbitrary."

> Few statutes have been found so wanting in "rationality" as to fail to satisfy the "essentially arbitrary" test.

Accord, *Roy v Rau Tavern, Inc,* 167 Mich App 664, 669; 423 NW2d 54 (1988).

If obtaining medical records of blood alcohol test results violated constitutional search and seizure protections, then a fundamental right would be implicated, triggering the strict scrutiny-compelling state interest test. However, we have already determined that the statute does not authorize unreasonable searches and seizures.

Due process in criminal matters is a fundamental interest that would trigger strict scrutiny. *In re Contempt of Stone,* 154 Mich App 121, 128; 397 NW2d 244 (1986), lv den 426 Mich 854 (1986). Due process protects a person from governmental deprivation of a liberty or property interest. *Edmond v Corrections Dep't,* 143 Mich App 527, 533; 373 NW2d 168 (1985). As previously discussed, the scope of the privilege "right" is determined by statute. The only "deprivation" effected by subsection (9) is the deprivation of the right to assert the evidentiary doctor-patient privilege.

The second prong of the inquiry is whether the Legislature had a rational basis for enacting subsection (9). One possible rational basis is safety. If statutory procedure requires a driver involved in an accident to be arrested before the blood alcohol test were administered, the procedure would lead to delays in treatments for injured drivers while the arresting officers took the steps necessary for a legal arrest. Second, in an attempt to combat the tremendous cost in lives and property damage to our society, the Legislature has chosen "to ease the prosecution of drunk drivers [who have been involved in an accident] by making the results of

blood alcohol tests performed by hospitals available to prosecutors, without the use of otherwise cumbersome procedures." *People v Stoney,* 157 Mich App 721, 726; 403 NW2d 212 (1987). As the Michigan Supreme Court stated in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 542; 273 NW2d 829 (1979):

> "If it be said, the law is unnecessarily severe, and may sometimes do injustice, without fault in the sufferer under it, our reply is: these are considerations that may very properly be addressed to the legislature, but not the judiciary—they go to the expediency of the law, and not to its constitutionality."
>
> The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's. Perfection is not required:
>
> "[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary."

We find that subsection (9) is rationally related to the legislative goal of protecting the safety of both drivers and passengers traveling in our state.

V

Defendant alternatively asserts that the trial court erred in admitting into evidence blood test results because the prosecution failed to show that the results had been obtained pursuant to the statutory requirements. Specifically, defendant contends that the prosecution failed to prove that the blood sample had been taken by "a licensed

physician, licensed nurse or medical technician." MCL 257.625a(4); MSA 9.2325(1)(4). *People v Cords,* 75 Mich App 415, 427; 254 NW2d 911 (1977). Defendant's blood, however, was not withdrawn and offered into evidence under subsection (4) (which applies when blood is withdrawn pursuant to a police request). Where a blood test offered into evidence was withdrawn pursuant to police order, a demonstration of compliance with certain statutory requirements is particularly necessary in order to ensure the reliability of the test results. In the instant case, however, the police were not involved in the withdrawal of defendant's blood. To be admissible under subsection (9), the prosecution must show that the blood on which the test results are based was withdrawn for the purpose of medical treatment. Here, the parties stipulated (and the evidence clearly demonstrated) that the blood drawn from defendant on which the test results were based was withdrawn for medical treatment. If the professionals knowledgeable in the field consider the test results sufficiently reliable for purposes of very significant decisions as to medical treatment, the inference is compelling that the Legislature considers the test results sufficiently reliable for evidentiary purposes. Therefore, the safeguards found in subsection (4) are not found in subsection (9). Accordingly, the trial court did not err in admitting the test results into evidence.

In conclusion, we affirm defendant's convictions of manslaughter.

Affirmed.